Next case on the calendar is Gagliardi v. Sacred Heart University. We have Mr. Heiser representing Mr. Gagliardi. Thank you, your honor. Good morning. May it please the court. Why don't we just make sure Mr. Escanso for Sacred Heart University. Good morning, your honor. Thank you very much. Good morning. All right, now you can go, Mr. Heiser. Go ahead. Thank you, your honor. I apologize. May it please the court. Pursuant to the Supreme Court's Bostock v. Clayton County and its discussion of the but-for causation, we believe that there is more than abundant questions of fact related primarily, but not exclusively, to the retaliation issues presented in this case. And we believe the district court erred in granting summary judgment because it accepted facts alleged by the defendant as true, while at the same time disregarding facts alleged by the plaintiff, and then failing to accept those facts alleged by the plaintiff in the light most favorable to the plaintiff. Mr. Heiser, there were certain uncontroverted facts that the district court pointed to, which included, I think, you can correct me if I'm wrong, that after the October 2015 complaint, your client's salary was raised by more than 40 percent. They made him eligible for part-time benefits, and I think other things were pointed to as well. So what, if they were retaliated against, isn't that an unusual way to be retaliated? Well, certainly, your honor, that there's no question that he did receive that salary increase after the October 2015 letter. However, after that occurred, there was additional protected activity that Mr. Gagliardi proceeded with. The primary issue that Mr. Gagliardi had raised in the past and continued to raise, starting again in July of 2016, was his part-time status. That was not addressed by the October... Didn't they rehire him in 2016, though? They rehired him prior to his exercising his protected activity in the summer and fall of 2016. On July? I thought you said July. It was July, right? July of 2016 was when Mr. Gagliardi raised the issue of his part-time status with Human Resources. And they didn't terminate him at that point, because this is the second time now he's been They did not terminate him when he brought the issue to the attention of Human Resources, your honor. However, that letter that Mr. Gagliardi wrote was dated July 30th, 2016. That letter was not addressed by Sacred Heart until a meeting between Mr. Gagliardi and Mr. Hardy of the Human Resources Department on September 7th of 2016. May I ask you to address what happened in the fall? Again, I know you're focused on what's disputed and not disputed, so maybe you can clarify this. The sheriff pointed to evidence that he arrived late to every practice. He missed several practices. He arrived five hours late to the Yale tournament and missed the first day of the UConn men's invitational tournament, which I think caused him to forfeit or cancel. I don't know what the term is, but can you respond to those? Sure, absolutely, your honor. With respect to the practices, the testimony from Mr. Gagliardi was that he had the players on the team arrive for practice at three o'clock. The official time for practice to start was 3 30. He admits that this was based on his schedule, that he was working another job, but he arrived at 3 30 after the players had warmed up and gotten ready. What evidence is there that the university agreed to that? Because he had this new job, he could show up a half an hour late other than saying, I felt that that was okay. They made in their briefing an argument that employees don't get to define the nature of their job, the employer does. If someone showed up to work late every day, an hour late, and says, well, I thought I could come in an hour late, that's not going to be enough, right? So, your honor, I think that one, there are serious questions there as to what was acquiesced to or agreed to or not. But Mr. Gagliardi certainly had the discretion to handle his coaching duties in the manner that he saw best fit. And what he determined was that it made sense to have the tennis team show up early, get warmed up, and then be able to get the most out of the practice beginning at 3 30. During the time that he was doing this, your honor, there were no objections. This was something that was being done in the open. And I will note for the record that when Sacred Heart went back after the fact to investigate whether there were student complaints, because there are surveys of players, there were no complaints from the players about this having occurred. So, at a minimum, your honor, and I know exactly where, you know, what your position is, at a minimum, there are questions of fact as to whether Mr. Gagliardi was- What about the tournament? I think in his deposition, he said that he agreed that the week before the tournament, he said, I'm not going to be able to So, your honor, saying it's not a problem would be a stretch. I mean, there obviously is a problem when you have scheduling issues like this. However- That's a big problem, right? That's not like being late for a practice. That's a tournament. Well, your honor, so there is evidence in the record that establishes that it was a regular practice of both tennis coaches to use the assistant to cover matches. There's evidence that the women's coach did this as well. There was a discussion about the UConn tournament and the fact that the assistant coach, Mr. Cook, would be covering the Friday portion of the tournament. At the same time, there was a discussion of a conflict that Mr. Gostelli, the women's tennis coach had, and he had intended to use Mr. Cook to cover that conflict. Unfortunately, in the interim, Mr. Cook broke his ankle, which meant that Mr. Cook could no longer cover the Friday part of the tournament. So, this is not a situation where the appellee- Who's responsible then for finding someone else to cover at that point? Your honor, certainly Mr. Gagliardi as the head coach, but also Mr. Gostelli as the director of tennis would have had an obligation to do their best to do that. There are questions there that need to be interpreted by a jury, not the court. May I ask a factual question about the record of Mr. Gagliardi? It seems to me that Mr. Gagliardi was only required to work part-time, and he, I think probably legitimately, says, I'm supposed to work 25 hours from now on, I'm not going to work overtime. You tell me I'm part-time, I'm going to stick to part-time. Is there anything in the record that documents how many hours Mr. Gagliardi worked during these various weeks when he had to show up for a tournament on the weekend, or how many hours he worked at the practices, whether he was late or early or whatever? Unfortunately, your honor, there's not great evidence in the record as to the hours for those particular weeks. There is evidence, however, that Mr. Gagliardi had started tracking his hours going back several years, but primarily after he was told in 2015 and then again in 2016 that he should only be working 25 hours. For the final year, does he have a running account, a diary or something? Is there anything like that in the record? Your honor, no, not which is the timekeeping system, and your honor will note that in our papers we note that it was extremely unclear to everyone whether coaches were supposed to be entering their time or not. I'm not asking about whether he was obligated to register his time or not. I'm asking whether he even has his own self-serving, whatever he wrote down himself at the time, is there any record at all on his behalf that says during this final year when I'm insisting on working 25 hours, I actually work 25 hours each and every week or work 20 hours one week and 30 the next? Yes, your honor. I appreciate you clarifying that for me. There is, your honor, Mr. Gagliardi's letter to Mr. Hardy states that explicitly. That is the July 30, 2016 letter. Mr. Hardy acknowledges, again from HR, that in fact it was clear that Mr. Gagliardi was working more than the 25 hours that he was supposed to be working. Is it currently or in 2016? That was in reference to his complaints starting in July of 2016 and into September of 2016 at the time that they then terminated him. Okay. Yeah, that is in there, your honor. Where do we find that in the record? So the letter to Mr. Hardy is at A-276, your honor, of the appendix. The review of the, bear with me, I'm sorry, your honor. A-421 and A-289 are the notes with respect to the meeting between Mr. Hardy and Mr. Gagliardi. Okay, that's helpful. Thank you very much. All right. Thank you, Mr. Heiser. You've reserved your two minutes and we'll hear now from Mr. Sconzo. Thank you, your honor. Thank you, your honor. Good morning. May it please the court, James Sconzo representing Sacred Heart University. I'd like to pick up, if I may, on the questions that Judge Bianco raised. And in particular, I wanted to point out in the record that Mr. Gagliardi began raising complaints, the very complaint he raised in July of 2016, dating back to at least 2006, Judge. And as Judge Bolden correctly pointed out, consistently the university addressed those complaints, rehired Mr. Gagliardi, and indeed in 2016 gave him a large raise and benefits. And as Judge Bolden questioned, how then would it be that you could show that the termination in 2016 was retaliatory when for the span of his career at the university, he had been raising these same issues? It just defied common sense. I'd like to go to some of your other questions, Judge, which is why it would be an employer would not terminate a head coach of a Division I athletics team who showed up to every practice late and then skipped part of and came late to the two only tournaments that were held that fall. And I think that's the correct question. And I think that's where Judge Bolden ultimately landed on his decision. These are Division I athletes operating at the highest level of collegiate athletics. They devote a significant amount of time to this. They could have gone to other colleges, yet they chose the Sacred Heart University. Mr. Gagliardi had a very significant responsibility for the care, attention, and mentoring of these athletes. But what he did, Your Honor, in the summer of 2016, he took a job with the Ansonia School District, knowing that it would conflict with his responsibilities at the university. And indeed, that is why he was late to every practice and missed or was late to the two tournaments because he prioritized his job at a public school district ahead of his obligations for the Division I athletes over which he coached. Can I just ask you, the tournaments are a different issue, I guess, but on the practices, you heard Mr. Heiser say that the school never, nobody ever told him that that was a problem. I mean, he said the players didn't say it was a problem, but I guess that's less important than the school. Why did the school not, did the school know he was doing that? Or why didn't the school say something to him about that? I can't answer whether or not the school said anything to him as he was missing the practices. But Mr. Gastelli, his supervisor, did raise the issue with human resources. And there are notes about that. And that was the basis for his termination. And I would also say, Your Honor, that it is incorrect, what Attorney Heiser said, that practice started at 330. Practice did not start at 330. And the plaintiff testified in his deposition that practice started at three. But what he chose to do instead was let the young man hit the ball around until he showed up for practice. So it's the university's position that Judge Bolden gave the plaintiff ample opportunity both on the prima facie case and pretext. But the plaintiff was unable to adduce any evidence on either the prima facie case or pretext. And I would point out to Your Honors, what we think is a very important case, D.C. Airy versus Countess Stonington. And Judge Parker, you were on that panel. And in that case, this court said, to make a showing of pretext to survive summary judgment, a plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the defendant were false, and that more likely than not, discrimination was the that Mr. Gagliari submitted that type of evidence. He fusses around with the notes of Rob Hardy about the decision making to terminate him. And he construes those notes the way he wants to construe those. And he also talks about some stray comments that Brad Herbert and Bobby Valentine, athletics administrators, made. None of those comments have anything to do with the decision to terminate. And there's simply no evidence, whatever, that he either met the prima facie case for his claims or that he has evidence of pretext. Once again, and I don't think this can be emphasized enough, these claims of unequal pay and part-time status date back to at least 2006. And if the plaintiff wants to quibble with that, in 2014, he raised these in an email to Human Resources. He was given a good evaluation after that. He was rehired after that. In 2015, he raised them again. He was given another good evaluation. He was rehired then. In 2016, he raised the issue again, yet he was rehired, allowed to start his job, but yet he was oppositionally defiant, would not show up to practice on time, and probably worse yet, failed to show up and showed up late to two significant tournaments at UConn and at Yale. Do you want to spend one minute on the comparator issue? Yes, I would, Your Honor. Thank you very much. I apologize I didn't get into that already. I didn't think that was such a big part of the case. But there is no apt comparator to Mr. Gagliardi. Mr. Gagliardi was qualified for one thing and one thing only, to coach tennis. And he can't compare himself to Mr. Gustelli, who was the head of the women's tennis team, because Mr. Gustelli had several other jobs. Mr. Gustelli was a senior administrator in athletics. He was the director of the program, and he supervised Mr. Gustelli. So I think the plaintiff would agree with that, that he can't compare his pay to Mr. Gustelli's because Mr. Gustelli was paid for the additional responsibilities he had. Mr. Gagliardi cites to some other women's programs, teams at the university. He can't compare himself to those teams. First, those teams all had larger rosters than his team. Two, he wasn't qualified to coach any of those sports, so he can't make that comparison. Third, the team structure, budgets for other teams are all decided in a very complex way that takes into account, among other things, the university-wide gender equity compliance under Title IX. And so it would not be a linear comparison by any stretch to say, because the women's equestrian team had a full-time head coach, I'm being discriminated against because I wasn't paid on a full-time basis. That would fail. That cannot be an appropriate comparison. Mr. Gagliardi points to the Bagley case, which has to do with comparison of professors, but that might be an apt comparison. Professors generally, they may have different disciplines in their academic field, but generally professors have more comparable responsibilities within a university. That is not so in athletics, and the plaintiff has not cited one case, Your Honor, which allows him to make that comparison, and Judge Bolden correctly pointed that out. All right. Thank you. Are you going to rest on your papers? I'll rest on our papers. Thank you for the time, Your Honor. Mr. Heiser, you have two minutes in rebuttal. I forgot to ask you this when you started, Mr. Heiser. I just want to confirm. I saw in your reply that you made clear you're not challenging the dismissal of the Equal Pay Act claim, right? That's correct, Your Honor. All right. Well, what about the Title VII claim? Are you still pursuing that? Yes, Your Honor, we are, both the retaliation and the... Here you have a case where your client is a male. All the decision makers are male. What's the gender? Your Honor, it's our position that the gender of the decision makers is irrelevant. It's the gender of the coaches and the teams that are being coached by those coaches that is the relevant issue, and in this case... I don't understand that at all. Sure. Let me explain, Your Honor. Mr. Gagliardi's testimony... I mean, none of the players were fired or disciplined. Say that again, Your Honor. I'm sorry. I mean, this case doesn't involve anything that happened to any of the female players. No, of course not, Your Honor. This is a claim by the coach and simply that every female coach was full-time. Every female coach who was full-time had an assistant coach. Every tennis coach was part-time. No, that's... Well, Your Honor, that's a difficult question to address because Mr. Bostelli was not just a tennis coach. Exactly. He had another job at the university that presumably took a significant amount of time. He was, in fact, your client's boss, among other things. He was definitely his supervisor, Your Honor. No question about that. Absolutely. What about the concession? There was, in the district court opinion, that there was a concession at oral argument below that your client lacked the qualifications to coach any of the women's sports teams. So why isn't that a problem? Well, Your Honor, if the comparator analysis is limited in a coaching perspective to just coaches of the same sport, then huge numbers of coaches would never have a comparator. And just going back to the Bagley case and what Attorney Sconzo said about instructors... What I just read didn't say tennis. It said lack qualifications to coach any women's sports team, not just tennis. No, Your Honor. I'd have to see that reference, Your Honor, but that certainly was not... I don't believe that that's... The concession was that he was not qualified to coach other sports. But I'm sorry. I still don't understand your contention that you have a record that supports discrimination on the basis of gender. And what are you pointing to? Sure. Mr. Gagliardi, unlike all of the female coaches, was not made full-time and was not provided the support of an assistant coach. Are there other male coaches at Sacred Heart University? There are other male coaches and there are other male coaches of women's teams. And are any of the male coaches part-time? The golf coach is part-time. And I believe that is it, although I might be wrong on that, Your Honor. Are you arguing that it's supportive of your position that there are two male coaches who are part-time? And is there a female golf coach? The female golf coach is coached by both of them. The same coach for both teams. I'm sorry. So there's... So what you have is there are women's coaches in other sports who are full-time, but the only male coaches in tennis are part-time. And the golf coach is part-time coaching both men's and women's teams. So I'm having a little trouble understanding. It's not... Yes, all the female coaches are full-time. So are most of the male coaches. But there are these two situations in particular sports where you have part-time coaches who happen to be male. Is that a fair statement of what the overall gender composition of the coaching staff is? That's a fair statement of the overall composition of the coaches. And can I just try to disaggregate a little bit? You said his Title VII claim is based on both the gender of the coaches and the gender of the players. Is the idea that that's an associational claim? I know, Your Honor, and I may have misspoken when I said the gender of the players. What I was intending to say was that the gender of the coaches who happen to all be coaching women's teams. Okay, I got it. And are you still pressing a Title IX claim? So, Your Honor, I acknowledge that the Title IX claim and the Title VII claim are analyzed in the same manner and that the circuit hasn't specifically addressed whether there's an individual claim under Title IX. There would be distinct claims, assuming there were an individual claim under Title IX or an individual claim under Title IX. The problem is that women students who participate in certain sports are discriminated against because they have only part-time coaches, where the male team equivalent had full-time coaches, for example. Would that be a claim that a coach who was male could make? Or is that only a claim for the students to make, assuming anyone has an individual right of choice? Your Honor, I believe that that, and honestly, I don't know that that's an issue in this case, but I believe that that would have to be a claim of the students. Okay, that's why I'm wondering what your Title IX claim is. I understand that he has a Title VII claim based on gender discrimination against him. And I think there's at least a theory, I don't know whether you pressed it at all, but it's been argued in this case, that if someone is discriminated against in his employment because he works with a lot of women, even if he's male, maybe that's some kind of Title VII claim. I know there are race discrimination claims of that sort, where a white employee says, I was discriminated against, not on the basis of being white, but on the basis of the fact that I was friendly with the black employee, something like that. But that's still a Title VII claim, that's not a Title IX claim. And I'm just trying to disaggregate what claims are you actually making here? Yeah, so, Your Honor, our Title VII and Title IX claims are based on the same facts and virtually the same arguments. And the title... And the claim is based on the fact that he is being mistreated as a man, not as a coach of men's team. Or am I wrong about that? No, individually as a man. Okay, got it. Then it seems like it just blends into the Title VII claim. And Your Honor, I absolutely concede that they blend in together. Okay, thank you. I just wanted to make sure I knew, because there was the Equal Pay Act claim, that's gone. And the Title IX claim is not anything distinct from the Title VII claim. No, and Your Honor, the analysis from... And that's why we didn't address the difference in the analysis in our papers. We concede that they are dealt with. And I believe Attorney Sconzo said the exact same thing in their papers. I understand then. Thank you very much. Thank you very much. Mr. Heiser and Mr. Sconzo, we'll reserve decision. Have a good day. Thank you, Your Honor.